THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

JEFFREY R. GREEN,

                              Plaintiff,

              v.

ALLSTATE INSURANCE COMPANY,

                              Defendant.

Case No. 3:11-cv-00210-TMB

MEMORANDUM OF DECISION

## I.      INTRODUCTION

Plaintiff Jeffrey Green ("Plaintiff" or "Green") is the owner of a triplex at 411 E 46th

Place in Anchorage.[1]  Green had a homeowner's insurance policy with defendant Allstate

Insurance Company ("Defendant" or "Allstate").[2]  Wells Fargo Bank ("Wells Fargo") is listed as

the mortgagee under the policy.[3]  In October 2010, a fire damaged the top two units of the

triplex—the unit where Plaintiff lived and a rental unit.[4]  On April 8, 2011, Allstate issued a

letter denying Green's claim based on exclusions for loss of property due to "[i]ntentional or

criminal acts of or at the direction of the insured person"[5] after Allstate concluded that "the fire

---

[1]  Dkt. 359 at 1.

[2]  *Id.*

[3]  *Id.*

[4]  *Id.* at 1-2.

[5]  Dkt. 26-2 at 1; Dkt. 359 at 3.

1

loss was not accidental but intentional."[6]  In August 2011, Plaintiff filed suit against Defendant

alleging breach of contract and seeking compensatory and consequential damages.[7]

A six day jury trial was held in June 2013 to determine whether Plaintiff's loss was the

result of an intentional or criminal act by Plaintiff.[8]  The Court declared a mistrial on June 24,

2013 after the jury failed to reach a verdict.[9]  A second trial was held in September 2013.[10]  The

jury reached a verdict in favor of Plaintiff on September 13, 2013, and found that the value of

Plaintiff's personal property lost in the fire was $80,000.[11]

Following trial, four issues remained to be decided by the Court:  (1) the cost to repair or

replace Plaintiff's residence; (2) the amount that Plaintiff is entitled to receive to repair or

replace his residence; (3) the amount of additional living expenses Plaintiff is entitled to receive;

and (4) the amount of lost rental income Plaintiff is entitled to receive.[12]

The Court held a one day evidentiary hearing on January 3, 2014, at which the parties

presented exhibits and witness testimony.[13]  The parties subsequently submitted written

responses to questions from the Court, proposed findings of fact and conclusions of law, and

---

[6] Dkt. 26-2 at 2.

[7]  Dkt. 1.  Plaintiff's case was removed to federal court on October 19, 2011.  *Id.*

[8]  Dkts. 174, 176, 177, 178, 182, 183.

[9]  Dkt. 183.

[10]  Dkt. 294.

[11]  *Id.*

[12]  *See* Dkts. 313, 325.

[13]  Dkt. 341.

final summary arguments.[14]  Federal Rule of Civil Procedure 52(a) provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."  Having considered the testimony of the witnesses, exhibits admitted into evidence, and the parties' submissions, the Court makes the findings of fact and conclusions of law set forth below.[15]

## II.    FINDINGS OF FACT

### A.    The Evidence

#### 1.    Witnesses

1.      Seven witnesses testified at the hearing on January 3, 2014.[16]  Plaintiff testified on his own behalf.  The Court finds that Plaintiff's testimony was generally credible; however, as discussed below, Plaintiff's testimony regarding certain issues was not corroborated by reliable evidence.

2.      Plaintiff also called David Hermann, Mike Gallagher, Benjamin Oien, and Douglas Lipinski.[17]  Hermann is the owner of Action Environmental, a company that provides asbestos abatement services.[18]  Oien is a structural engineer who provides structural inspection

---

[14]  Dkts. 357, 358, 359, 354, 360.

[15]  In this memorandum of decision, the Court does not purport to recite all of the evidence submitted and arguments made by the Parties, but rather focuses on the evidence and arguments supporting the Court's findings and conclusions.  *See* Fed. R. Civ. P. 52(a) advisory committee's note ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.").

[16]  *See* Dkt. 341 at 1.

[17]  *Id.*

[18]  Dkt. 349 at 7.

and design for small commercial residential buildings.[19]  Lipinski is the general manager for

Taylored Restoration.[20]  The Court finds that the testimony of Hermann, Gallagher, Oien, and

Lipinski was generally credible.

3.       Defendant called Laurie Brummett and Richard Gerwin.[21]  Brummett is a staff

claim service adjuster at Allstate Insurance Company who reviewed Plaintiff's claims file prior

to testifying.[22]  Gerwin is "an estimator or project manager" at ServiceMaster of Alaska, a home

restoration business.[23]  Gerwin was asked by Allstate to visit Plaintiff's property prior to the

hearing to prepare an estimate for repairs.[24]  The Court finds that the testimony of Brummett and

Gerwin was generally credible.

*2.       Exhibits*

4.       The Court admitted ten exhibits.[25]  Plaintiff submitted a November 22, 2013

estimate for asbestos remediation from Action Environmental for $67,168;[26] building plans for

Plaintiff's residence;[27] a November 2010 estimate for the repair of Plaintiff's residence by

---

[19]  *Id.* at 41-42.

[20]  *Id.* at 54-55.

[21]  Dkt. 341 at 2.

[22]  Dkt. 349 at 149-50.

[23]  *Id.* at 179.

[24]  *Id.* at 180.

[25]  *See* Dkts. 341 at 1-2; 343.

[26]  Exhibit 118, admitted 1/3/13.

[27]  Exhibit 121, admitted 1/3/13; *see* Dkt. 349 at 27.

4

Taylored Restoration for $244,609.74;[28] a November 5, 2013 estimate to demolish and rebuild

Plaintiff's residence prepared by Michael Gallagher at MG Construction for $595,500;[29] a

November 8, 2010 estimate from Action Environmental for asbestos remediation for $34,605;[30]

and a November 1, 2010 estimate for asbestos remediation from Action Environmental for

$52,355.[31]

     5.     Defendant submitted Plaintiff's 2008 and 2009 tax returns;[32] Plaintiff's

Department of Corrections Inmate Location Records;[33] Plaintiff's November 29, 2010 sworn

statement and proof of loss;[34] and a January 2, 2014 estimate for repairs to Plaintiff's residence

prepared by Rick Gerwin at ServiceMaster for $286,928.02.[35]

          *B.*     *Cost to Rebuild or Repair Plaintiff's Residence, Plaintiff's Lost Rental Income, and Plaintiff's Additional Living Expenses*

     6.     The parties agree that asbestos was used in the construction of Plaintiff's

residence and is therefore present in Plaintiff's home.[36] Action Environmental provided an

---

[28] Exhibit 122, admitted 1/3/13; *see* Dkt. 349 at 61.

[29] Exhibit 125, admitted 1/3/13.

[30] Exhibit 128, admitted 1/3/13; *see* Dkt. 349 at 16-17. Hermann testified that he was asked to remove "a couple portions of the scope of the work from the first proposal" prior to creating the second proposal. *Id.* at 17.

[31] Exhibit 129, admitted 1/3/13. See Dkt. 349 at 14.

[32] Exhibit C, admitted 1/3/13.

[33] Exhibit H, admitted 1/3/13.

[34] Exhibit I, admitted 1/3/13.

[35] Exhibit L, admitted 1/3/13, at 38.

[36] Dkt. 359 at 3.

estimate on November 1, 2010 for asbestos remediation in the two damaged units in Plaintiff's residence for $52,355.[37]  Action Environmental provided a revised estimate on November 8, 2010 for $34,605.00.[38]  The second estimate omitted abatement from the "common long entry hallway" and "the long garage."[39]  Action Environmental provided an updated estimate dated November 22, 2013 for asbestos remediation throughout the entire residence for $67,168.[40]  The revised estimate states that, unlike the previous estimate, it includes all interior areas of the triplex, all three residential units, the large common entry way, hall, and long garage.[41]

       7.      Craig Nelson of Taylored Restoration prepared an estimate for repair of Plaintiff's residence in October 2010.[42]  The estimate for repair was $244,609.74, including $45,997.46 for "general demolition."[43]

       8.      Michael Gallagher, a general contractor[44] hired by Plaintiff, prepared an estimate in November 2013 to demolish and rebuild Plaintiff's residence.[45]  Gallagher's estimate to

---

[37]  Exhibit 129.  See Dkt. 349 at 14.  The first proposal included "Units A & B, common long entry hallway, the long garage and exterior debris piles."  Exhibit 129 at 1.

[38]  *Id*.; Exhibit 128.  The second proposal included "Units, A & B, and the cleaning up of exterior debris piles."  *Id.* at 1.

[39]  *Compare* Exhibit 129 at 1 *with* Exhibit 128 at 1.

[40]  Exhibit 118.

[41]  *Id.* at 1.

[42]  Dkt. 359 at 2.

[43]  *Id.* at 3; Exhibit 122.

[44]  The Court takes judicial notice of Mr. Gallagher's business license # 915385, *available at* http://commerce.alaska.gov/CBP/Main/BLDetail.aspx?id=915385.

[45]  Exhibit L, Admitted 1/3/13.

rebuild Plaintiff's residence is $595,500, which includes: $483,615 for rebuilding, and $111,885 for asbestos remediation,[46] demolition and dump fees, and landscape and clean-up.[47] Gallagher's estimate is based on a calculation of approximately 2,200 square feet of living space[48] at a cost of $175 per square foot and a 963 square foot garage[49] at a cost of $100 per square foot.[50] The estimate obtained by Plaintiff is based solely on a price per square foot using "standard builder grade" materials.[51] The estimate does not contain an itemized list of materials and labor or state the cost of either.[52]

9. Rick Gerwin, an estimator and project manager at ServiceMaster of Alaska hired by Defendant, prepared an estimate to repair Plaintiff's residence in January 2014.[53] Gerwin's total estimate for repairing Plaintiff's residence is $286,928.02.[54] This estimate does not include

---

[46] Gallagher arrived at $73,855 for asbestos remediation using Action Environmental's $67,168 estimate for asbestos remediation plus a 10% "contractor markup." Dkt. 359 at 10; *see* Exhibit 125, Admitted 1/3/13.

[47] Exhibit 125.

[48] Dkt. 349 at 29.

[49] *Id.* at 30.

[50] *Id.* at 35.

[51] Dkt. 349 at 38.

[52] *See id.* at 38-39.

[53] Exhibit L.

[54] Exhibit L at 2.

costs for mold or asbestos remediation.[55]  Gerwin's estimate does contain an itemized list of labor and materials with costs for each item.[56]

      10.     Ben Oien, a structural engineer hired by Plaintiff who inspected Plaintiff's residence on October 3, 2013, testified that the residence "had been severely water-damaged throughout . . . the framing and the foundation"; that there was "six or eight inches" of standing water in the basement; that there is "black mold everywhere"; that the visible exterior studs are water-damaged; that "most of the roof structure" and "a bunch of the upper walls" were damaged beyond repair; that he would not certify the foundation of Plaintiff's residence for use; and that there is no portion of the existing structure that is useable for new construction.[57]

      11.     Gerwin, a project manager at ServiceMaster of Alaska, testified for Defendant that during his inspection of Plaintiff's residence in December 2013 he observed "about six inches of ice" on the bottom floor, a badly burned roof and "roof truss system," and "apparent water damage."[58]  According to Gerwin, "everything was frozen."[59]  Gerwin testified that he believed the structure could still be repaired because "the framing, the structure seemed to be intact," but also stated:  "However, normally what we would do is actually have a structural engineer take a look at it once everything's thawed out to determine whether it was compromised

---

[55]  Dkt. 359 at 5; *see* Exhibit L.

[56]  *See* Exhibit L at 2-37.

[57]  Dkt. 349 at 44, 49.

[58]  *Id.* at 180-81.

[59]  *Id.* at 181.

or not."[60]  Gerwin prepared an estimate for repair of Plaintiff's residence that included testing for asbestos and lead (but not removal) for $286,928.02.[61]  Gerwin's estimate includes $29,500 for "general demolition," which is described as:  "Labor to remove all remaining contents, demo ceilings and walls down to the framing, and remove roof."[62]  But Gerwin conceded that his bid could change dramatically based upon the opinion of a structural engineer,[63] and testified that his bid did not include the cost of hiring an industrial hygienist to create a cleanup protocol for mold,[64] or the cost of lead and asbestos remediation.[65]  Gerwin testified that ServiceMaster does not do demolition and rebuilding.[66]

  12. The Court finds that Plaintiff's residence must be demolished and rebuilt.  Gerwin testified that he would need to seek the opinion of a structural engineer before he repaired Plaintiff's residence to determine whether apparent flooding in the lower level of Plaintiff's residence caused damage to the foundation.  Oien, a structural engineer, testified that Plaintiff's residence could not be repaired.  Defendant presented no testimony from a structural engineer.  The evidence presented therefore supports a finding that Plaintiff's residence cannot be repaired and must be demolished and rebuilt.

---

[60]  Id. at 184.

[61]  *Id*. at 181; Exhibit L at 38.

[62]  Exhibit L at 2.

[63]  Dkt. 349 at 186.

[64]  *Id*. at 185.

[65]  *Id*. at 187-88.

[66]  *Id*. at 190.

13.     Based on the evidence presented, the estimated cost of demolishing and rebuilding Plaintiff's residence is $595,500.00, including $483,615.00 for construction, plans, and permits; $73,855 (Action Environmental's estimated $67,168 plus a 10% "contractor markup") for asbestos remediation; $30,000 for demolition and dump fees;[67] and $8,000 for landscape and clean up.[68]

### C.     Coverage Limit Under Plaintiff's Policy

#### 1.     Total Amount Available to Plaintiff Under Policy

14.     Plaintiff's property was insured in 2010 by a Deluxe Homeowner's insurance policy issued by Allstate.[69]  Coverage A of the Allstate Deluxe Homeowner's policy provides for coverage of the structure; the facial amount under the policy is **$349,000**.[70]

15.     The facial limit of Coverage A is adjusted by the Building Structure Reimbursement Endorsement to the policy, which raises the coverage by 20%; the facial limit for Coverage A is therefore **$418,800**.[71]

16.     The Coverage A limit is further adjusted by additional provisions within the policy, including the Debris Removal provision of the Additional Protection coverage, which

---

[67]  The Court notes that Gerwin's estimate for "General Demolition," which included removal of all remaining contents, demolition of ceilings and walls down to the framing, and removal of the roof, was $29,400.00.  Exhibit L at 2.

[68]  *See* Exhibits 125, 118 at 2; Dkt. 359 at 10.  Defendant provided an estimate from ServiceMaster to <u>repair</u> Plaintiff's residence, but provided no testimony or exhibits regarding the cost to <u>replace</u> Plaintiff's residence.

[69]  Dkt. 359 at 1.

[70]  *Id.* at 5.

[71]  *Id.*; *see also* Dkt. 357 at 4.

provides up to an additional 5% of the property coverage shown on the declarations—
$349,000—for additional demolition expenses.[72]  The total available for demolition expenses is
therefore **$17,450**.

> 17.    The policy also provides
>
>> up to 10% of the insurance shown on the Policy Declarations under
>> Coverage A . . . to comply with applicable laws regulating the
>> construction, use, or repair of any property or requiring the tearing
>> down of any property after a covered loss to covered building
>> structures and when repair or replacement results in increased cost
>> due to the enforcement of these laws.[73]

The Building Codes provision in the Alaska Amendatory Endorsement to Plaintiff's Deluxe
Homeowner's Policy further states:  "The amount of insurance provided by this coverage is a
separate limit of liability, and is the maximum we will pay for any one loss.  Coverage only
applies to that portion of the dwelling that was damaged due to a covered loss."[74]  The total
amount available to Plaintiff to comply with applicable laws regulating the construction or repair

---

[72]  Dkt. 359 at 5-6.

[73]  Dkt. 33-34 at 4.  Defendant cites "Exhibit A, admitted on 9/11/13" and "Bates No. 100202"
for the proposition that "treatment or removal and disposal of contaminants, toxins or pollutants
as required to complete repair or replacement of that part of the building structure damaged by a
covered loss" falls within the policy limits.  Dkt. 357 at 5.  Defendant did not attach Exhibit A to
its briefing or file it for the Court, but Bates No. 100202 appears at Docket 34-33.  *See* Dkt. 34-
33 at 11.  The Building Codes provision appears in the Alaska Amendatory Endorsement to
Plaintiff's Deluxe Homeowners Policy, and therefore supersedes this portion of Plaintiff's
policy.  *See* Dkt. 33-34 at 1, 4.  It is thus unclear to the Court why Defendant contends that costs
incurred to abate asbestos in compliance with state law would fall within the policy limits.  *See*
Dkt. 357 at 5 n.30.

[74]  Dkt. 33-34 at 4.

of property under the Building Codes provision is **$34,900**. Because state law regulates the abatement of asbestos in remodeling and demolition jobs,[75] Plaintiff is entitled to this coverage.

18.     The total amount available to Plaintiff under his policy for demolition, complying with applicable laws for asbestos remediation, and rebuilding is **$471,150.00**.

    *2.     Amount Remaining Following Allstate's Payment to Wells Fargo*

19.     The parties agree that Wells Fargo is listed as Plaintiff's mortgagee under the policy and qualifies as the loss payee.[76]

20.     Wells Fargo submitted a claim as loss payee under the policy on August 2, 2012 for $332,998.43.[77] On September 4, 2012, Allstate made a payment to Wells Fargo for $230,855.14 pursuant to the loss payee clause,[78] calculated by using Taylored Restoration's November 2010 estimate for repair for $244,609.74,[79] adding $9,664.36 for a flooring estimate and $9,075.68 for emergency services and winterization work, and subtracting $22,418.96 for recoverable depreciation, $9,075.68 for two prior payments made to Taylored Restoration, and the policy's $1,000 deductible.[80]

---

[75] *See* A.S. § 18.31.200 ("A person may not be employed to abate an asbestos health hazard unless the person has been certified in a program approved by the Department of Labor and Workforce Development under (a) of this section."); 8 AAC 61.600 ("A person performing, directly supervising, or monitoring asbestos abatement work must have a certificate issued under 8 AAC 61.720. The certificate must be in the person's possession when performing work subject to AS 18.31.200. and must be shown to a representative of the department upon request.").

[76] Dkt. 359 at 1.

[77] *Id.* at 6; Dkt. 315-2 at 1.

[78] Dkt. 359 at 6.

[79] Exhibit 122; Dkt. 315-1 at 3.

[80] Dkt. 315-1 at 3.

21. Plaintiff's policy states that if the insured does not repair or replace his or her residence, "payment will be made on an actual cash value basis," deducting for depreciation.[81] If the structure is repaired or replaced within 180 days of the actual cash value payment, a claim for additional payment may be made.[82] But Defendant has agreed through an arrangement with Wells Fargo's agent, MSI,[83] to allow Wells Fargo to complete repairs to Plaintiff's residence and submit claims for additional money under the policy,[84] including for the $22,418.96 of recoverable depreciation withheld and any additional money required to make repairs to the property,[85] by December 31, 2014.[86]

22. The Court finds that Plaintiff is entitled to an additional **$240,294.86** under his policy, plus prejudgment interest, to rebuild his residence. Pursuant to the Lender's Loss Payable Endorsement in Plaintiff's policy[87] and the agreement between Wells Fargo and Allstate,[88] Defendant shall provide the principal amount to Wells Fargo for rebuilding.[89]

---

[81] Dkt. 34-33 at 10.

[82] *Id.*

[83] MSI is the public adjuster who was hired by Wells Fargo to present Wells Fargo's claim to Allstate. Dkt. 349 at 159.

[84] Dkt. 354 at 6.

[85] Dkt. 357 at 5 n.25.

[86] Dkt. 349 at 160.

[87] *See* Dkt. 34-33 at 24.

[88] Dkt. 354 at 6.

[89] This is consistent with the Court's order at Docket 322. *See* Dkt. 322 at 6.

### D. *Plaintiff's Additional Living Expenses*

23.     Plaintiff's policy covers payment for Additional Living Expenses ("ALE"). Amendatory Endorsement AP 1233-1 amends the Additional Living Expense provision of Plaintiff's policy and states: "We will pay the reasonable increase in living expenses necessary to maintain your normal standard of living when a direct physical loss we cover under Coverage A . . . makes your residence premises uninhabitable."[90] Plaintiff's policy requires the insured to "produce receipts for any increased costs to maintain [his or her] standard of living while [he or she] reside[s] elsewhere."[91]

24.     Immediately after the fire occurred in October 2010, Plaintiff received temporary housing from the Red Cross for two to three days.[92] The Red Cross then paid for Plaintiff to stay at the Parkwood Hotel for one night.[93] Allstate paid for Plaintiff to stay at the Executive Suites for the next two nights and at the Captain Cook Hotel for approximately a month and a half.[94] Allstate paid these hotels directly.[95] Plaintiff then received permission from Defendant to enter a month to month lease for an apartment that rented for $1,850 per month.[96] Defendant paid $1,850 directly to Plaintiff's landlord for the month to month lease.[97] Defendant continued to

---

[90] Dkt. 34-34 at 2.

[91] Dkt. 33-34 at 9.

[92] Dkt. 359 at 3.

[93] *Id.* at 115-16.

[94] *Id.* at 116-17.

[95] *Id.* at 110-11.

[96] *Id.* at 3-4.

[97] *Id.* at 111.

make monthly payments to Plaintiff's landlord through May 2011.[98]  When Defendant denied Plaintiff's claim, Defendant ceased making payments for ALE.[99]

25.     Plaintiff was incarcerated between January 23, 2011 and March 14, 2011; between May 29, 2012 and June 16, 2012; and between September 6, 2012 and June 6, 2013.[100]

26.     Plaintiff testified that he moved into the shed at his triplex on June 1, 2011 after Allstate denied his claim, and that he continued to split his time between the shed and the triplex unit that was not destroyed by fire until he went to jail again on May 29, 2012.[101]  When Plaintiff was released on June 16, 2012, Plaintiff returned to the shed and triplex unit until he returned to jail on September 6, 2012 for 273 days.[102]  When Plaintiff left jail in June 2013, Plaintiff lived in an apartment belonging to a friend;[103] and from July to September 2013, Plaintiff split his time between that apartment and a home on the hillside while serving as a caretaker for one of his third party custodians, Dr. Merchant.[104]

---

[98]  *Id.* at 3-4.

[99]  *Id.*

[100]  Dkt. 359 at 4.

[101]  Plaintiff testified that he returned to jail around May 28, 2012 for about two weeks.  Dkt. 349 at 90-92.  Plaintiff's Department of Corrections records indicate that Plaintiff was arrested on May 29, 2012 and released to third party custody on June 16, 2012.  *See* Exhibit H.

[102]  Dkt. 349 at 92.

[103]  Dkt. 349 at 92.

[104]  *Id.* at 93.

27.     Plaintiff was ordered to remain in third party custody following his release from jail on March 14, 2011,[105] and June 6, 2012.[106]

28.     Plaintiff lived with his third party custodians after his release on bail on June 6, 2013.[107]  Plaintiff testified that he is currently living at the apartment belonging to a friend on Muldoon, and that his third party custodian stays with him.[108]  Plaintiff was provided with the use of that apartment in exchange for his assistance with cleaning up the unit.[109]  The rental unit has no working boiler.[110]

29.     Plaintiff testified that he would like to use ALE payments from Allstate to rent his own place,[111] but did not confirm that his third party custodian would be able to reside with him at a new place.[112]

30.     Brummett testified that Plaintiff's policy requires the insured to produce receipts for any increased costs to maintain his or her standard of living after a loss, but conceded that

---

[105]  Exhibit H.

[106]  Exhibit H.

[107]  Dkt. 359 at 4.

[108]  *Id.* at 94.

[109]  *Id.*

[110]  *Id.*

[111]  *Id.* at 95.

[112]  According to Plaintiff's Alaska Department of Corrections record admitted on January 3, 2014, Plaintiff was released on bail/bond on June 6, 2013 for 137 days; no third party custody condition is indicated.  The Court takes judicial notice that Plaintiff was released to third party custody on this date, however, and that Plaintiff was released to third party custody again on January 24, 2014 in *Alaska v. Green*, Case No. 3AN-14-00282CR (Alaska Super. Ct. filed Jan. 10, 2014).

"there is no provision in [Plaintiff's] policy that states" that an insured cannot receive ALE if the insured does not have receipts for ALE incurred.[113]  Brummett also indicated that receipts are only required for expenses above a certain amount, testifying:  "[S]ometimes we have to delve into a gray area.  But if you don't have a receipt for a $15 meal, I'm not going to hold you to that.  If you don't have a receipt for a $1,500 rental, I would probably hold you to that because there is a huge difference between $15 and $1,500."[114]

     31.     Both Brummett's testimony as well as Allstate's payment of Plaintiff's rent through May 2011 support a finding that Allstate does not require its insureds to produce receipts in order to receive payment for ALE.  Allstate's payment of $1,850 per month to Green established that $1,850 was a "reasonable increase in living expenses necessary to maintain [Green's] normal standard of living [after] a direct physical loss [covered] under Coverage A . . . [rendered Green's] residence premises uninhabitable."[115]  Allstate's payment for Green's ALE during his incarceration between January 23, 2011 and March 14, 2011, a total of 51 days,[116] and for two months after Plaintiff was ordered to reside with a third party custodian following his release,[117] indicates that it is not against Allstate's policy to provide ALE to maintain a house

---

[113] Dkt. 349 at 166.

[114] *Id*. at 167.

[115] Dkt. 34-34 at 2; *see Zamarello v. Reges*, 321 P.3d 387, 393 (Alaska 2014) ("The goal of contract interpretation is to give effect to the parties' reasonable expectations ... [which] must be gleaned not only from the contract language, but also from extrinsic evidence, including evidence of the parties' conduct . . . .") (quoting *Miller v. Handle Constr. Co.,* 255 P.3d 984, 988–89 (Alaska 2011) (citations and internal quotation marks omitted)).

[116] *Id.* at 4.

[117] *See* Exhibit H, indicating Plaintiff was released to third party custody on March 14, 2011. Defendant continued to pay $1,850 per month through May 2011.

after a covered loss occurs while the insured is away from his home due to incarceration or court-ordered supervision by a third party custodian.[118]  As the Court noted during the evidentiary hearing, reading the policy to preclude Green from receiving ALE for periods of time during which he was imprisoned or living with third party custodians simply because he was away from home would also preclude members of the armed forces from obtaining ALE to pay for temporary housing for their families and belongings for periods of time during which they are deployed following a covered loss.  Such a reading of the policy would be contrary to both "the reasonable expectations of a layperson seeking coverage" [119] and a plain reading of the policy.

32.     Plaintiff has not, however, presented evidence that he incurred or needed to incur any additional living expenses while incarcerated or living with third party custodians in order to store his belongings or provide shelter for dependents.  To the contrary, Plaintiff argued at trial that he had lost all of his belongings in the fire at issue.[120]

33.     Plaintiff testified that he lived with a third party custodian who claimed that he resided at Plaintiff's residence, 411 East 46th Place, following his release on June 6, 2013.[121] According to Plaintiff's testimony, however, Plaintiff did not reside in his triplex with the third party custodian during this time:  Plaintiff lived in an apartment belonging to a friend until July

---

[118]  *See* Dkt. 249 at 167.

[119]  *United Servs. Auto. Ass'n v. Neary*, 307 P.3d 907, 910 (Alaska 2013) (noting that courts construe insurance policies "to honor the reasonable expectations of a layperson seeking coverage").

[120]  *See, e.g.*, Dkt. 349 at 107 ("When – when the fire took place, like I explained earlier, I lost everything in the fire. . . . it hit me hard because I lost everything that I had worked for and everything that I had accumulated during my 50-some-odd years of life.  I just lost everything.").

[121]  Dkt. 349 at 122-23; *see* Exhibit H.

2013;[122] and from July to September 2013, Plaintiff split his time between the apartment and a home on the hillside.[123]  Plaintiff paid no rent during this time.[124]

34.     The Court finds that Plaintiff is not entitled to any additional ALE because Plaintiff has either been incarcerated or on release to third party custodians at all times following the date when Allstate denied Plaintiff's claim.[125]  Plaintiff has presented no evidence to suggest that he did incur, or that he would have incurred but was unable to afford, additional living expenses during the time that he was incarcerated or on release to third party custodians. Although Plaintiff indicates that he would like to rent his own apartment, Plaintiff is currently under a "24-hour sight and sound" third party custodian order of release.[126]

35.     One possible exception to this finding is the two time periods in 2011 and 2012 during which Plaintiff resided at his residence between June 1, 2011 and May 29, 2012, and between June 16, 2012 and September 6, 2012.  Plaintiff testified that he moved between the shed at his triplex and the unit of his triplex that had not been destroyed by the fire during these

---

[122]  Dkt. 349 at 92.

[123]  *Id.* at 93.

[124]  *Id.*

[125]  *See* Exhibit H; Exhibit G; *Alaska v. Green*, Case No. 3AN-11-00948CR (Alaska Super. Ct. filed Jan. 23, 2011); *Alaska v. Green*, Case No. 3AN-12-09256CR (filed Sept. 16, 2012); *Alaska v. Green*, Case No. 3AN-14-00282CR (Alaska Super. Ct. filed Jan. 10, 2014).

[126]  *See Alaska v. Green*, Case No. 3AN-12-09256CR (filed Sept. 16, 2012) (Temporary Order for third party custody entered February 7, 2014); *Alaska v. Green*, Case No. 3AN-14-00282CR (Alaska Super. Ct. filed Jan. 10, 2014) (Temporary Order for third party custody entered February 7, 2014).

time periods.[127]  Plaintiff's Department of Correction records indicate that he was released to

third party custody prior to both time periods,[128] but Plaintiff did not present evidence that his

third party custodian was living with him at his residence.  Plaintiff testified that he had an ankle

monitor when he was released in June of 2012[129] but provided no evidence to support this

testimony.  If Plaintiff was permitted to wear an ankle monitor, or if Plaintiff's custodian was

residing with Plaintiff at his residence during this time, Plaintiff would have been able to incur

additional living expenses while abiding by his order of release and thus would be entitled to

reimbursement for those expenses.  Plaintiff may submit proof that he had an ankle monitor or

that his custodian resided with him during the times that Plaintiff lived at his residence in 2011

and 2012 to obtain up to fifteen months[130] of ALE at $1,850 per month.[131]

### E.    Plaintiff's Lost Rental Income

36.    Plaintiff's policy states:  "We will pay your lost fair rental income from a covered

loss under Coverage A . . . less charges and expenses which do not continue, when a loss we

cover under Coverage A . . . makes the part of the residence premises you rent to others, or hold

for rental, uninhabitable.  We will pay for lost fair rental income for the shortest time required to

---

[127]  *See* Dkt. 349 at 90-92.  Although the unit Plaintiff inhabited was not destroyed by the fire, Plaintiff's triplex had no working utilities.  *See* Dkt. 349 at 100.  Plaintiff heated his shed with propane.  *Id.* at 84.

[128] *See* Exhibit H (indicating that Plaintiff was released to a third party custodian on March 14, 2011 for 443 days, and on June 16, 2012 for 83 days).

[129]  Dkt. 349 at 121.

[130]  June 1, 2011 to May 29, 2012 is twelve months; June 16, 2012 to September 16, 2012 is approximately 3 months, for a total of 15 months.

[131]  As noted below, Plaintiff shall submit such evidence no later than **June 18, 2014**.  If Plaintiff files such evidence, Defendant may respond no later than **June 25, 2014**.  In the absence of a filing by Plaintiff, the Court's ruling shall stand.

repair or replace the part rented or held for rental."[132]  Plaintiff's policy requires the insured to produce "records supporting any claim for loss of rental income."[133]

37.     Plaintiff testified that he "had no trouble renting" the two rental units of his triplex, and that they were rented "all through 2010."[134]  Plaintiff testified that he charged $800 for the upstairs rental unit ("Unit C") and $1,100 for the downstairs rental unit ("Unit B").[135] Plaintiff contends that Unit C was rented at the time of the fire and that a new tenant had made a deposit for Unit B and was due to take occupancy the next day.[136]   But Plaintiff has provided no evidence to support these claims.

38.     To support his claim that Unit C was rented in 2010, Plaintiff cites (inaccurately) testimony by Kevin Young, who testified that he had rented the unit for over a year and moved out in September 2010.[137]  But Mr. Young did not state the amount he paid to rent Unit C.

39.     Plaintiff produced tax returns for 2008 and 2009 to support his position that he is entitled to $1,900 per month in lost rental income, less expenses.[138]  Plaintiff also produced an

---

[132] Dkt. 34-34 at 3.

[133] Dkt. 33-34 at 9.

[134] Dkt. 349 at 105-06.

[135] *Id.* at 105.

[136] Dkt. 359 at 6.

[137] Dkt. 358 at 7.  Plaintiff cites Dkt. 348, Pg. 21-22, Pg. 25; Kevin Young's testimony actually appears in the transcript at Docket 347.

[138] *See* Exhibit C (admitted at the January 3, 2013 evidentiary hearing by Defendant).

amended 2010 return.[139]  Plaintiff did not include rental income in his 2010 tax return initially[140] but filed an amended tax return after the trial in September 2013 to include a Schedule E with omitted rental income, expenses, and depreciation.[141]

40.     In 2008, Plaintiff reported $10,300 in rental income, $23,875 in expenses, and $11,425 in depreciation—a net loss of $25,000 related to the two rental units.[142]  In 2009, Plaintiff reported $11,000 in rental income, $15,069 in expenses related to his rental property, and $12,252 in depreciation, resulting in a net loss related to the two rental units of $16,321 for 2009.[143]  In 2010, Plaintiff reported $19,000 in rental income, $10,556 in expenses, and $8,242 in depreciation, resulting in a net gain of $202.[144]

41.     Plaintiff contends that the average amount of monthly "nonrecurring" rental expenses was $100 per month.[145]  But Plaintiff testified that a majority of his listed rental expenses did not continue following the fire, including:  auto and traveling, cleaning and maintenance, insurance, repairs, "supplies," taxes, utilities, internet, pest control, plumbing and

---

[139]  *See* Dkt. 358-1 (Schedule E of Plaintiff's 2010 Return).  Plaintiff contends that he provided Defendant with this return in its entirety.  Dkt. 358 at 7.  Defendant did not admit this return at the January 3, 2013 hearing.

[140]  Dkt. 349 at 102.

[141]  *Id*. at 103-104.

[142]  Dkt. 349 at 133; Exhibit E at 302139.

[143]  Dkt. 349 at 132; Exhibit E at 302123.

[144]  Dkt. 358-1.

[145]  Dkt. 359 at 11.

electrical, and insurance premiums.[146]  Plaintiff also testified that in 2010 he began requiring his tenants to pay their own utilities, and that utilities were not listed as an expense in 2010.[147]

42.     The Court finds that Plaintiff has not provided sufficient support to establish that his lost monthly "fair rental income" for Units B and C was $1,900 per month, or that his average monthly nonrecurring rental expenses was $100 per month.

43.     In light of the circumstances surrounding Plaintiff's 2010 amended return, the Court declines to rely on Plaintiff's 2010 return in making its determination.  Although Plaintiff's 2010 tax return is consistent with Plaintiff's testimony that he received $1,900 per month in rental income, Plaintiff concedes that he amended this tax return after the jury verdict in September "when the issue of the returns became relevant and Mr. Green realized the error in his original tax filing."[148]  The disparity between the amount stated on Plaintiff's 2010 amended return, which was prepared for use in this proceeding, and the amounts stated on Plaintiff's 2008 and 2009 returns raises questions about the amount of rental income stated on Plaintiff's 2010 return.  The absence of any support for Plaintiff's testimony regarding the amount he charged for each unit, such as leases, bank statements, cancelled checks, or testimony from tenants, other than Plaintiff's amended 2010 tax return further calls into question Plaintiff's claim that his monthly "lost fair rental income" was $1,900.

---

[146]  Dkt. 349 at 147-48.

[147]  *Id.* at 148.

[148]  Dkt. 358 at 7.

44. The Court finds that the following "charges and expenses" listed on Plaintiff's 2008 and 2009 tax returns[149] did not continue following the fire: auto and travel, cleaning and maintenance, insurance, "commissions," legal and other professional fees, repairs, utilities, internet, pest control, plumbing and electrical, mortgage insurance premiums, and telephone.[150] The total for these expenses in 2008 was $12,088. The total for these expenses in 2009 was $10,351.

45. In 2008, Plaintiff's rental income less $12,088 in "charges and expenses" that did not continue following the fire was negative $1,788 (a loss).[151] Plaintiff's rental income for 2009 less $10,351 in "charges and expenses" that did not continue following the fire was $649, or $54 a month.[152]

## III. CONCLUSIONS OF LAW

Plaintiff seeks to recover: (1) the cost of replacing Plaintiff's residence, including demolition and asbestos abatement; (2) consequential damages caused by Plaintiff's breach of contract; (3) compensation for additional living expenses (ALE) from June 2011 through the present, future ALE, and prejudgment interest; and (4) lost fair rental income for Units B and C,

---

[149] The Court does not find Plaintiff's 2010 amended return to be a reliable source of information.

[150] *See* Dkt. 349 at 147-48; Exhibit C at 302123, 302139. Although Plaintiff did not testify that expenses for "commissions," legal and other professional fees, and "telephone" no longer continued after the fire, Plaintiff offered no support for a finding that these expenses, as they relate to the rental units, continued after the fire. Expenses for mortgage interest and "other interest" would have continued following the fire as expenses related to the triplex as a whole, and not to the rental of the units.

[151] *See* Exhibit C at 302139.

[152] *See* Exhibit C at 302123.

less costs and expenses that did not continue following the fire.[153]  Defendant has asserted a

number of legal arguments that, if accepted, would either preclude liability or reduce Plaintiff's

damages.  The Court's conclusions of law on these issues are set forth below.[154]

### A. Cost to Rebuild Plaintiff's Residence

1. As discussed above, based on the testimony presented, the Court finds that
Plaintiff's residence must be demolished and rebuilt.  The total amount available to Plaintiff
under his policy for demolition, complying with applicable laws for asbestos remediation, and
rebuilding is **$471,150.00**.[155]

2. On September 4, 2012, Allstate made a payment to Wells Fargo as Plaintiff's loss
payee for $230,855.14.[156]  The Court therefore finds that Plaintiff is entitled to an additional
**$240,294.86** under his policy to demolish and rebuild his residence, plus prejudgment interest.[157]
Defendant shall issue the principal amount to Wells Fargo as Plaintiff's loss payee to rebuild
Plaintiff's residence, pursuant to the policy[158] and the parties' agreement.[159]

---

[153] *See* Dkt. 359 at 12-15.

[154] To the extent that any of the Court's findings of fact are arguably conclusions of law, they are not restated in this section and are incorporated herein by reference.

[155] *See supra* Part II.C.1.

[156] Dkt. 359 at 6.

[157] *See supra* Part II.C.2.

[158] *See* Dkt. 34-33 at 24.

[159] *See* Dkt. 359 at 13 (Plaintiff states that Defendant "may issue payments to Wells Fargo and Plaintiff jointly on the principal portion of this award in order to protect the secured party's interest."); Dkt. 354 at 6, Dkt. 349 at 160 (Defendant has agreed to reimburse Wells Fargo for additional money spent to repair or rebuild Plaintiff's residence and recoverable depreciation through December 31, 2014).

3.      Plaintiff contends that he is entitled to $123,850.86 more than the policy limits as consequential damages that were proximately caused when Defendant breached its contract with Plaintiff by denying Plaintiff's claim.[160]

4.      Plaintiff also seeks $80,000 in consequential damages because he has "suffered hardship due to the deprivations he suffered over the last three years," and claims that Defendant "has not presented evidence to rebut the allegation that their breach caused Plaintiff hardship."[161]

5.      Plaintiff cites a Court of Appeals of Indiana case in which the court held that "reasonably foreseeable economic losses" arising from a good faith dispute between an insurer and its insured may be recovered as consequential damages under a fire policy.[162] Defendant cites a Southern District of Indiana case applying Indiana law for the proposition that consequential damages are "generally precluded as a matter of law" where there is a good faith dispute regarding coverage.[163]

6.      The Alaska Supreme Court has not ruled on whether consequential damages may be awarded following good faith disputes between insurers and insureds.

---

[160] Plaintiff seeks a total of $595,500 to rebuild his residence under the terms of his policy and as consequential damages that were proximately caused by Defendant's breach of contract with Plaintiff. *See* Dkt. 359 at 13 ("The increased cost of replacing the home is a consequential loss which is a direct and proximate result of Allstate's breach of contract with the Plaintiff. Allstate is liable for this amount irrespective of any policy limits.").

[161] Dkt. 359 at 17. Plaintiff also requests consequential damages for "the inconvenience and hardship caused by the Defendant's willful breach of the insurance contract." *Id.*

[162] *See Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 67-68 (Ind. Ct. App. 2009).

[163] Dkt. 354 at 7 (citing *Burleson v. Illinois Farmers Ins. Co.*, 725 F. Supp. 1489, 1494-95 (S.D. Ind. 1989).

7.     The Court finds that Allstate denied Plaintiff's claim in good faith after it concluded that Plaintiff was responsible for the loss of his residence,[164] and that controlling precedent does not support a finding that Plaintiff is entitled to an award of consequential damages following Defendant's good faith denial of Plaintiff's claim.  Even if controlling law permitted an award of consequential damages, the Court finds that Plaintiff has failed to establish that Defendant's breach "was the cause in fact"[165] of the additional damage that occurred to his residence between the time of the fire and the present.[166]   The Court therefore declines to award Plaintiff consequential damages.

### C.     Additional Living Expenses

8.     On the basis of Plaintiff's evidence, the Court concludes that Plaintiff is not entitled to $1,850 in monthly ALE for rent during the periods of time Plaintiff was incarcerated and during the times that Plaintiff was ordered to live with a third party custodian.

9.     The Alaska Supreme Court has not ruled on whether additional living expenses provisions like the one in Plaintiff's policy require that the additional living expenses be incurred before an insured may receive money for ALE.  Defendant cites a 2011 case in which the Fifth Circuit applying Louisiana law found that insureds were not entitled to ALE that had not been

---

[164]  *See* Dkt. 57 at 7-8 (August 7, 2012 Order dismissing Plaintiff's claim for bad faith against Defendant).

[165]  *Rockford*, 911 N.E.2d at 67.

[166]  The Court also notes that Plaintiff's request for $80,000 in consequential damages for hardship and suffering resulting from Defendant's denial of his claim would not be supported by the precedent Plaintiff cited; inconvenience and hardship are not "reasonably foreseeable *economic*" damages.  *Rockford*, 911 N.E.2d at 67-68 (emphasis added).

incurred.[167]  Defendant also cites a Supreme Court of Alabama case in which the court found

that, "under the clear and unambiguous terms of the contract Allstate was under no duty to

provide any additional living expense payments" to the insured because the insured failed to

provide receipts for additional living expenses.[168]

        10.     Although the ALE receipt provision in Plaintiff's policy is identical to the

provision at issue in *Hiley*, the Court finds that the provision in Plaintiff's policy does not require

an insured to produce receipts prior to receiving ALE.  Reading the policy to require that

additional living expenses be incurred prior to reimbursement would preclude those who suffer a

total loss and are unable to pay for temporary living expenses from obtaining coverage for ALE.

Such a reading would be contrary to the reasonable expectations of an insured when obtaining an

insurance policy.[169]  Further, Allstate's conduct following Plaintiff's loss—paying Plaintiff's

landlord directly for monthly living expenses for seven months following Plaintiff's covered

loss—and Plaintiff's adjuster's testimony that requirement of receipts prior to reimbursement

involves a "gray area"[170] weighs against a finding that the policy requires an insured to pay for

---

[167]  *See French v. Allstate Indem. Co.*, 637 F.3d 571, 583 (5th Cir. 2011) (affirming district court's finding that, because Plaintiffs had not introduced evidence of any additional living expenses actually incurred and continued to reside at their house, they were not entitled to payments under the ALE provision of insurance policy).  Defendant also cites an unreported Northern District of California case, in which Allstate paid a $500 negotiated increase in monthly expenses for a year to insureds who opted to live with family members rather than in a hotel.  *See Cecena v. Allstate Ins. Co.*, No. 05-3178, 2007 WL 13245, at *6 (N.D. Cal. Jan. 16, 2007), which contradicts Allstate's position regarding documentation.

[168]  *Hiley v. Allstate*, 562 So.2d 184, 191-92 (Ala. 1990).

[169]  *See United Servs. Auto. Ass'n v. Neary*, 307 P.3d 907, 910 (Alaska 2013) (noting that courts construe insurance policies "to honor the reasonable expectations of a layperson seeking coverage").

[170]  *See* Dkt. 349 at 167.

ALE out of pocket and produce receipts for reimbursement. The Court does not construe this provision of the policy to preclude payment of ALE in the event that an insured does not have receipts, particularly when the insurer has established a precedent of paying the expenses directly.

11.     The Court nevertheless finds that Plaintiff is only entitled to ALE for periods of time when he could reasonably have incurred additional living expenses. Plaintiff does not contend that he incurred living expenses during the time he was incarcerated, or while he was required to live with a third party custodian as a condition of release.[171] Plaintiff provided no evidence that he had a need to, or would have been able to, rent an apartment even if Allstate had continued to provide the money for him to do so,[172] with the possible exception of the time he spent living at his triplex between June 1, 2011 and May 29, 2012, and June 16, 2012 and September 16, 2012.

12.     Because Plaintiff has been incarcerated or on release to third party custodians since Allstate rejected his claim in May 2011 and has provided no support for a finding that he incurred or needed to incur any additional living expenses during those times, the Court finds that Plaintiff is not entitled to payment for any additional living expenses.

---

[171] For example, Plaintiff presented no testimony or evidence that he incurred costs to store belongings while he was in prison or while living with third party custodians.

[172] To the contrary, the record indicates that Plaintiff's possessions were lost in the fire, *see* Dkt. 349 at 107, and that Plaintiff has never been in need of a rental apartment because he was either incarcerated or under a "24-hour sight and sound" third party custodian order of release since Allstate rejected his claim in May 2011, *see* Exhibit H; *Alaska v. Green*, Case No. 3AN-11-00948CR (Alaska Super. Ct. filed Jan. 23, 2011); *Alaska v. Green*, Case No. 3AN-12-09256CR (filed Sept. 16, 2012); *Alaska v. Green*, Case No. 3AN-14-00282CR (Alaska Super. Ct. filed Jan. 10, 2014).

13.     If Plaintiff can produce evidence to show that he was living with his third party custodian or permitted to use an ankle monitor during the two time periods in 2011 and 2012 that he lived at his triplex while under court order to reside with a third party custodian, Plaintiff is entitled to $1,850 per month in additional living expenses—the amount established by Allstate to be a reasonable monthly additional living expense[173]—for each month between June 1, 2011 and September 16, 2012 that Plaintiff lived at his uninhabitable[174] residence.  Plaintiff may submit proof that that he had an ankle monitor or that his custodian resided with him during the times that Plaintiff lived at his residence in 2011 and 2012 to obtain up to fifteen months[175] of ALE at $1,850 per month,[176] plus prejudgment interest.  Plaintiff shall submit such evidence no later than **June 18, 2014**.  Defendant may respond by **June 25, 2014** if Plaintiff submits such evidence.  In the absence of a filing by Plaintiff, the Court's ruling shall stand.

D.     *Lost Rental Income*

14.     The Court finds that Plaintiff is entitled to the total rental income less "charges and expenses" that did not continue following the fire based on the rental income and expenses reported on his most recent unamended tax return—his 2009 tax return.  As discussed above, the

---

[173]  *See supra* Part II.C.

[174]  During the time that Plaintiff lived at his triplex, the triplex had no working utilities, s*ee* Dkt. 349 at 100, and Plaintiff heated his shed with propane.  *Id.* at 84.  The Court construes Allstate's initial award of ALE for the seven months following the fire as a concession by Defendant that Plaintiff's triplex was uninhabitable following the fire.

[175]  June 1, 2011 to May 29, 2012 is twelve months; June 16, 2012 to September 16, 2012 is approximately 3 months, for a total of 15 months.

[176]  *See supra* Part II.D.

Court finds that this is the most credible evidence of Plaintiff's actual rental income at the time of the fire.

15. Plaintiff's rental income for 2009 less "charges and expenses" that did not continue following the fire was $649, or $54 a month.[177]

16. The Court awards Plaintiff $54 in monthly rental income for each of the months that Plaintiff has been displaced from his residence. Plaintiff's total award for lost rental income is **$1,674**,[178] plus prejudgment interest.

#### E. *Future Damages*

17. Plaintiff is entitled to $54 per month in lost rental income for each additional month required to rebuild Plaintiff's residence. Defendant shall pay Plaintiff $54 each month beginning June 1, 2014 until Plaintiff's residence is rebuilt.

18. If the period during which Plaintiff has been ordered to live with a third party custodian ends before Plaintiff's residence has been rebuilt, Plaintiff will be entitled to $1,850 per month in additional living expenses until he is able to return to his residence.

### IV. CONCLUSION

For the foregoing reasons, the Court finds and concludes that Defendant Allstate Insurance Company is liable to Plaintiff Jeffrey R. Green in the amount of **$241,968.86** for rebuilding Plaintiff's residence and for 31 months of lost rental income, plus prejudgment

---

[177] *See supra* Part II.E; Exhibit C at 302123. The Court notes that the average annual expenses that did not continue after the fire for 2008 and 2009 was $11,219.50—approximately $935 per month. The average annual rental income for 2008 and 2009 was $10,650—approximately $887.50 per month. The Court also acknowledges, however, that Plaintiff testified that he charged $800 for one unit and $1,100 for the other unit, and that the units were rented continuously until the fire. *See* Dkt. 349 at 105.

[178] Plaintiff has been displaced from his home for 31 months as of May 2014.

interest.  Defendant shall pay **$240,294.86** to Plaintiff's loss payee Wells Fargo pursuant to the policy upon entry of judgment so that demolition and rebuilding can begin immediately**.** Defendant shall pay Plaintiff the remaining award of **$1,674** for lost rental income and all prejudgment interest.  Plaintiff is also entitled to **$54** per month in lost rental income beginning June 1, 2014 until Plaintiff's residence is rebuilt.

In light of this order, Plaintiff's outstanding motions at **Docket 313** and **Docket 328** are **DENIED as moot**.

Dated at Anchorage, Alaska, this 5th day of June, 2014.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE